Good morning. I guess it's good afternoon now. May it please the court. Good afternoon, your honors. My name is Glenn Kulik. I represent the plaintiffs and the appellants in this case. I'd like to reserve two minutes for rebuttal, please. Sure. In the Ninth Circuit, it is admittedly very difficult to meet the extrinsic test in a copyright infringement case involving the literary materials. However, it's not impossible, nor should it be impossible. After all, in deciding a summary judgment motion, the court does have to follow the law. That means, for example, that the evidence must be construed in a light most favorable to the non-moving party. It also means that the decision has to be based on evidence that's actually in the record. If the district court is going to decide as a matter of law that an idea is commonplace or that the should not be allowed to make that proclamation, although it is a self-evident truth that's contained in the Bible, it should be required at least to disclose the basis upon in which it made that decision. Doesn't it make a difference what kind of a story we're talking about? I mean, could a judge say a love story or a love triangle is a sin affair? Your honor, I suppose that in the most generic sense, there are some stories that might be subject to that. How about a father-daughter reconciliation? No, I disagree with that, your honor. Again, our case goes well beyond a father-daughter reconciliation. If that was the only similarity in these two works, I would not be standing here today and I would not have been involved in the case. It's because that's not expression. That's an idea, but that's not an expression of the idea. And again, my feeling is that the trial judge, she may have decided in her own personal mind that there was not substantial similarity in protectable elements and protectable expression here. But what I'm asking the court to do is to decide that a reasonable juror could disagree with her, because I believe this case is different. I understand it's difficult to meet the extrinsic test, but I believe this case does. And after all, this court has, from time to time over the years, reversed decisions of the district court which have granted summary judgments to defendants in cases like this one. And I believe that the facts of this case present such a scenario. Now, today, defendants feel that all they have to do is wave Binet and funky films in front of the district court, and that automatically means summary judgment granted. Those cases were correctly decided on the facts of those cases. But the facts of those cases are not the facts of this case. There were similarities in those cases, but the similarities were in the backstory. They were in the premise. They did not extend to the plots as they unfolded over the course of the storyline. They did not extend to the major characters and who they really were in furthering that plot. In fact, the court said that one case, in the funky films case, one of the works was actually a murder mystery, and the other work, it was impossible to tell what the plot was. It didn't really have a plot, according to the court. It was just a series of interpersonal exchanges. In Binet, for example, the reason that the protagonist went to Japan was similar in both stories. However, what happened once he got there, and as the stories unfolded and the sequence of events occurred, there was no similarity, according to the trial court. You know, it's interesting because the way you're describing it is kind of the way I think about those cases, but it seemed to me you were also arguing, or perhaps it was only the amicus that was arguing, that differences are irrelevant and we should look only at similarities. But in fact, in every case, don't we have to also look at the differences? I say you have a main character who is a Korean immigrant who struggles to find happiness in Southern California, but everything else is completely different. You don't stop with the one thing, do you? I don't want to be constrained by what the amicus said. No, I understand that. I don't completely agree with you. Okay, that's what I was getting at, because I kind of read your brief to be going in that direction, and I'm concerned about that because it seems to me that one cannot put blinders on to the differences, even when amassing the similarities. Here's my difference of opinion with the amicus. In my mind, differences are relevant when those differences affect the sequence of events in the main storyline, or they affect the interactions between the major characters. If they're relevant to those questions, if they change those elements, then I believe differences are relevant. But if they are differences without any significance to the protectable expression, to the storyline as it unfolds, to the sequence of events, then I don't believe that the differences matter, and I can give you a couple of examples from this case. In one of the works, the protagonist, the male protagonist, is a baseball coach, and in the other one, he's a baseball scout. And to the trial judge, that was a difference. But I would submit to the court that any literary expert in the world would say, in the context of these overall stories, they were identical. They were identical. And the fact that one was a coach, as opposed to being a scout, had no impact on the major plot line. Well, it does. One guy's trying to get to the College World Series, and another guy is looking for prospects. That's why it's significant. Because they're significant to subplots, but they're not significant to what's the main storyline in both matters. And I guess that's the key. But see, I have problems with that, too, because, I mean, the main storyline could be boy meets girl, boy loses girl, boy finds girl. I mean, that's like the plot of 400,000 novels. So that's the main storyline, but that... But that's not the main storyline in this case. No, no, I understand that, but you seem to be saying if you have the main storyline, it has like a little box around it, and nobody else can have that same main storyline. There still has to be protectable expression. But what I'm saying is, if there is adequate protectable expression, the fact that there are some differences that go to a subplot or a different aspect of the story that don't affect the main storyline that starts at the beginning and carries all through the work, then I don't think that those differences are material. But if they do, if they do affect the main storyline, the actual protectable expression that what I'm saying, then I think they are relevant. If I can give your honors an example, I think this would be helpful. Not every case is dismissed on summary judgment by the Central District of California. A few years ago, I handled a case called Miller versus Miramax, and it involved Shakespeare in Love, which was a movie at the time that was very acclaimed. And there was a summary judgment motion on substantial similarity grounds, and Judge Pragerson denied the motion. He held there were triable issues of fact. Now what that case involved was my client's script had a couple of different plot lines to it, but the major plot line mirrored the film. They both involved a young Shakespeare who had achieved some acclaim. He had achieved some notoriety. He was generally known, but he had not yet written his most famous plays. He had not yet achieved his iconic status. And he was suffering from writer's block, and his producer was pressing him to complete his next play. Into his life comes a female protagonist who is engaged to another man who wants to act on the stage, but in those days women were not permitted to act on the stage. So she dresses up like a man in order to try out for Shakespeare's new play. He discovers the situation. They end up having a relationship, and their passionate affair enables Shakespeare to go on and start to write again. Now her fiancé discovers what's going on, and he decides that he is going to expose what is happening here at the command performance of this new Shakespeare play that is being performed. Shakespeare discovers what happens. He thwarts that plot, saves the day, but the woman ends up having to sail off to the new world at the end of both works. And as a result of that, Shakespeare is left behind brokenhearted, but yet passionate again about his writing and about life. That's what was similar about the two works. My client's work, however, had a second plot to it that was totally different. It was based on political intrigue that was going on in England at the time, and it had nothing to do with Shakespeare and love. But Judge Pragerson, in that case, I believe, correctly was able to filter out the non-protectable materials from the protectable expression. And he concluded that the protectable expression, as I just summarized it in a very brief fashion, was sufficient even though there were similarities, because those similarities had no impact on the most important storyline, as I just described it. I think that's this case. There is a storyline in Omaha about the team in trying to win the championship, but that is a secondary plot. It is a subplot. You can call it what you want, but the story is really about the father and the daughter, what happened to them years ago, and how baseball came between them, and the consequences. Do you have the exclusive right to tell that story? Well, again, when you say exclusive right, there are a lot of details in the story. I'm not going to point, nor I think can I, to one thing and say, father-daughter baseball story or father-daughter reconciliation. I can't point to those things and say that that's protectable expression and that's all we had that we could win this case. But what I'm saying is, and I think this is outlined by the three experts that we submitted declarations from, is that these are stories which have meat to them, that have details to them, and those details, big and small, are similar and indeed identical in many respects as you go along the story from the beginning to the end. I don't think you can just take one aspect and isolate it by itself and another aspect and isolate it by itself and say you could ever have protectable expression. But when you have, like in that Shakespeare in Love case, a prominent storyline that carries through the story in a similar sequence of events with similar details, both big and small, including some very fine details, I believe that at some point it becomes protectable expression, even if there are some other things going on in one or both scripts that are subsidiary or a sideline to the major plotline. So my problem with the district court's decision is that, respectfully, I don't think it was done as sophisticated as Judge Pragerson did it in the other case. I think it was too linear. I think it was too literal. For example, in one work the female character, Sandy, is based on the father's favorite baseball player, Sandy Koufax, and she's 32 years old. In the other story, the character is based on Mickey Mantle, who is her father's favorite baseball player, and she's 33 years old. To the district court in this case, those were differences. After all, one was 33 and one was 32, and one was named after Mantle and the other after Koufax. How about one's a lawyer bucking to be a partner and the other is, whatever she was, a divorced mother down on her You know what? Those are differences, but those differences have nothing to do with the story. They have nothing to do with the sequence of events and the progression of the storyline. I'm not sure about that. The purpose of those things... Doesn't she make a decision to leave her firm and pursue baseball? That's the essence of the story, is her giving up this artificial, urban life and search for her true passion. It seems completely different to me. Respectfully, I disagree with that. I think the point of the story is that she decided to give up that life for her father, and I think that same thing happens in the other work that is at issue in this case. I see you're down to about a minute and a half, and you said you wanted to reserve two. Did you want to complete a thought before you sit down? I will reserve my time. Thank you. Good afternoon, Your Honors. Matt Klein of O'Melveny & Myers, appearing on behalf of all of the appellees, my colleague, Laura Lorenz. I want to jump right on a couple points that my fine colleague made. I think the differences really do matter here, and one of the key differences that we pointed out in our briefs is that the baseball action in the Omaha movie, Coach Dodge's push to win the College Bowl Series, takes up 55 pages of the 117-page script that they submitted. At the beginning of the script, they thank real-life coaches, real-life college baseball coaches, four by name, including Mr. Brooks' college baseball coach at Texas, the coach at Arizona State, the coach at USC, and at present, I forget the last one, but the point of that story, a major plotline of that story, not a minor one, and you can't paper it over with descriptions, 55 pages are devoted to 20-plus baseball games, who wins, who loses in those games, the strategy in those games. There are seven long practice sequences. There are lengthy speeches given by the coach about how to play baseball, how to be a person. Him being a coach is hugely important to the story, and why is that? Because it gives him the platform to give these speeches about life. It gives him the platform to show that he's this commanding person. And unlike Mickey, his daughter Sandy is somebody who needs to be lifted up, and somebody he does need to reconcile with, and that's a basic point of overlap reconciliation. But Sandy's in a very troubled point in her life. They point to the fact that in both stories, there's this smoke alarm that goes off, but it's used in very different ways in the story. Coach Dodge calls Sandy, and she's with her two young children at home, and Monopoly money gets on the stove, catches fire. It's Coach Dodge who's reaching out to her, who's saying, let me help you change your life, I'm about to die. By the way, he doesn't disclose that fact, that key fact about his illness, to anybody in the story until he tells Jimmy, his coach, about halfway into the movie, and Sandy only learns that awful fact late in the movie, driving a further wedge between their relationship. And so, what happens in the Coach Dodge movie is, the coach is this iconic hero. He's a famous person. He's down on his luck. He's just learned that he's diagnosed with cancer. And what he's doing is he's making amends at the end of his life. He's reaching out to his team and saying, we have to come back and be good players again. He's reaching out to his daughter. He's saying, we need to make amends. You need to go back to college. I made a mistake by shunning you when you dated one of my players. I want you back in my life. Something very different is happening in Trouble at the Curb. You have a very quiet man in Gus who's at the end of his career. Let me cut to the chase. There are differences. There are also similarities. Yes. Why is that a jury question? Because this case, this court has held, as is the Supreme Court, there's an incredibly important line to be drawn here by judges applying these tests to make sure free expression is protected. And we want to have many, many, many, many stories. We want to have many retellings of stories like Romeo and Juliet. We want to have many stories retelling. Well, Romeo and Juliet is in the public domain at this point. It is. It is. But part of the way we protect expression is through copyright. Correct. But let me give you an example. And I want to point out two points as I do that. Number one, there was an assertion in the reply brief that we didn't get a chance to respond to that we did not bring these other works to the district court's attention, these other works to show that these were scenes of fear. Mr. Kulik was not trial counsel, so I think this was just an introvert in oversight. But we did at ER 650. And at ER 637, his trial counsel actually addressed these other works, which included Bull Durham, a league of their own, Major League. We talked about how Michael Corleone in The Godfather stops being a student, comes back into the family business. That's at 1280-1281. And the point here is that courts need to police these lines because these can become incredibly expensive cases. And this case is a very prototypical example of that. We submitted a virtual mountain of third-party evidence that Mr. Brown, our client, had written this script in a UCLA Law School class that not only had his UCLA Law School professor done work with him over the years to edit the script, he attested under penalty of perjury that all the story elements that were complained about in the complaint were mentioned in the original scripts. This is the prior creation? The prior creation. That's a different defense, isn't it? It's a different defense, but it's crucially important. As you think about cases like Metcalfe... And that, just a minute, on that subject, these early drafts were written before The Omaha was published, is that... Correct. They were written in the late 1990s. They were bought by the Bubble Factory, a big production company in town. Copies of it were sent out to Dustin Hoffman, who was briefly attached to the project. And there were sworn declarations, including very detailed charts showing how each element of the story appeared in the original script as we're complaining about in the complaint. And I understand you're saying, what's the relevance... No, no, I'm not going to say that. What I'm going to ask you about, though, is discovery was not complete on that issue. And the district court declined to rule on the discovery and declined to rule on summary judgment on that ground. Is that true? That is correct. Okay, so I don't... I guess I question whether that's an available separate ground on which we could affirm, since discovery was not complete. Your Honor, I think you could go either way on that question, but it's still relevant... Well, our case law doesn't seem to go either way. If there's open discovery disputes on an issue and the district court has reserved ruling, I'm not sure we can go there. You could find, and we're not necessarily asking you to do that, but you could find that there was an abuse of discretion in saying that she would have permitted additional discovery, given her other rulings, that, number one, the prior creation evidence was very strong. And number two, the evidence that they had adduced to date was not sufficient to rebut it. But even if you don't reach the prior creation ground, the reason why those facts are relevant is that access is disputed here. And if you look at the cases that the amicus in particular rely on and appellant relies on as well, Shaw, Metcalf, and the Sidcroft cases, those are the cases they say, look at those cases, those are important to us. In each one of those cases, you have access not only conceded, but you have extensive evidence of access. There's no such evidence here. And so what's a key point of distinction between those cases and this case is that access point. I thought they contended that... Hanfield wrote this script first for the plaintiffs and then switched sides. They submitted, they made that allegation in their complaint. When they examined the two witnesses they examined in the case, Mr. Brown explained that he had never heard of the plaintiff. They had a theory that he got it through his agent and at some point, Mr. Hanfield and Mr. Brown... I'm not saying there's not an answer to it, but isn't that their contention? No credible evidence on their side showing access, nor did they point to any during the district court. They did submit these two expert reports that said, we think based on our reading of the two works, these were written by the same person. But Judge Fisher, exercising her discretion, which you view for abuse of discretion, and there's no dispute about the standard of review of her ruling with respect to the experts, she said they made multiple errors and their two authorship experts, Mr. Yerkes and Ms. Antonio, had to reorder and reshuffle the scripts around to find these asserted similarities. And frankly, when they did, the things that they did point out that were similar, it was things like the words IMT room, which appear on pages of many, many, many scripts. It's not some special tick particular to any writer. It's the way that all writers designate that I'm starting a new scene. Here's where the scene is. It's in a room. It's in the interior of a room. Or things like they used ellipses to kind of end a thought before the next person speaks. Their own expert in his writing book said use ellipses, use short punctuation. And so Judge Fisher said, I'm not going to rely on those experts. I'm rejecting their testimony. She did not strike their reports as we asked her to do, but she certainly did not credit those reports. The other thing I'd like to mention is that... Is that proper on summary judgment? In other words, you know, I mean, that's a finding of fact, isn't it? I mean, in other words, I find that this, you know, expert's opinion is either not reliable or, you know, it's not based on proper research, or whatever it is. But I mean, it's a credibility determination, right? She did not make a credibility determination, Your Honor. She exercised her discretion. You know, that report's not worth relying on. She exercised her discretion under Rule 702 and the Daubert-Kumho-Tyre line of cases. And this Court has endorsed that approach in the Rice case, for example, where you had two magicians, these secret magicians who were revealing their tricks on these two different TV shows. And the plaintiffs in that case brought forward a very similar expert. And this Court said the District Court properly exercised its discretion not to credit that report. Why did it properly not credit that report? Because most of the things that they compared were non-protectable elements, and things that the law does not cognize as protectable, and does not cognize as evidence or indicia of copying. So you regard that ruling by Judge Fisher, I mean, say, equivalent to, I'll say, an unlimited motion that, well, I'm not going to let this witness testify? Correct, Your Honor. And that's what this case, this Court held in Rice. I don't understand it that way. I don't think that, I didn't understand her to be excluding their reports. You did not. I think that I understood her. I don't think any reasonable juror could find these people believable. Correct. Which is slightly different than saying that it's not admissible, which would be the motion in limine. I don't think it's the same as a motion in limine excluding a witness or excluding testimony. That's what this Court described the process as in Rice. Well, but that's not what this judge did. In Rice, and I'd want to go refer back to it, Your Honor, but I don't believe they were talking about a formal motion to strike the testimony there. And I don't want to misspeak because I don't have Rice in front of me. But I think what the Court did in Rice, and it happened in Corwin, it's an out-of-circuit case that we cited. Judge Wilson did this twice in the Apprentice case and the Good Housewife case. In one case, he decided to explicitly exclude the expert's testimony. That was Professor Nimra's testimony. In another case, he did what Judge Fisher did here, which was, look, there's a bunch of reasons why I'm not going to give this any credence, but I'm not explicitly going to strike the testimony. And the reason why, Your Honor, it's not a factual determination about credibility is he says, look, what you're talking about and are saying is virtually the same or is identical or is indicia of copying. As a matter of law, under Ninth Circuit copyright law and the United States Supreme Court copyright law, it's just not a similarity. And your method of analysis is not reliable, and this is the express holding in the Bethea case and in the Mueller case, where there are two specific experts who they used in this case, used the exact same methods. The Court said, the methods you're doing there of rejumbling the plots, of kind of papering over the differences in the story, of retreating to generalities, that's not helpful to the legal analysis. And so it's not probative of the legal issues we need to determine in applying the substantial similarity extrinsic evidence test. A couple other issues I'd like to point out, Your Honor. One of the kind of key issues that courts talk about in these opinions is pace of the movies. And one thing that kind of grossly distinguishes the two movies is that Mickey's trip with her father takes place over three or four days. It's a very intimate look into those three or four days her relationship with Johnny, her father, she and her father's relationship, this kind of technical, nuanced look into how scouting works and why some young phenom is hitting all these home runs as a swing flaw. It's a compressed period of time in their lives where she's making this one crucial decision that you pointed out earlier, Your Honor, which is, do I leave the law firm all this work that I've put in, these kind of 24-hour days constantly carrying my Blackberry around, a laptop around, do I leave that and do something, frankly, I'm really good at and I love and I can be with my dad, or do I go back? Omaha takes place over the course of a whole season. It's very typical of a sports movie. You begin with the team kind of coming together in the practice mode. You go into the kind of regular season and they have their ups and downs and then you get into the kind of playoffs at the end and the one nice twist in this movie is that they lose and the great lesson is lost in the losing and the coach shows his real character in dealing so well with that loss. Trouble With the Curve, its mood and its pace is very different. It kind of continues on that arc upwards towards the end where Sandy, I'm sorry, where Mickey's vindicated by finding this great young scout. Gus and Mickey are vindicated when Bo strikes out multiple times at Atlanta Brave Stadium. His contract's renewed. It's kind of the typical happy ending to the romantic comedy that at its core partly is with the Justin Timberlake character. I see my time's almost out. I know it's been a long day for everyone and I'll sit down if there's no further questions. I have no further questions. Thank you very much, Mr. Kline. Mr. Kulick. Thank you, Your Honor. I don't want to waste a lot of time on access because I don't think it's before the court. Suffice it to say, we submitted expert declarations, five or six of them, from former FBI agents all the way to some of the most prominent literary experts in this country. When you're talking about Richard Walter and Cheryl Antonio, who were the head of the screenwriting faculty at UCLA and NYU, respectively, you're talking about the two prominent screenwriting experts in this country. And Mr. Yerkes, who is the other expert, is a prominent and internationally recognized literary analyst. And so to so casually discard what they say, and the problem with completely discarding what they say in this case is what that means is that there's no evidence in the record from which the trial judge can make her determination. Well, there's the movie and the screenplay. Well, right. But other than that, I don't know what the district court's qualifications were as a literary expert. I don't know if the judge was a biochemistry major in college or if she was a comparative lit major in college. So she's just a regular person who occasionally goes to the movies, and she can see that The Godfather is not the same as Schindler's List. Then she should, then you know what, then she should tell us what it is that she's relying on, even if it's her own self-experience as much. She pointed out all these things that are different from one story to the other. Well, Your Honor, I think she drew conclusions, and they were subjective conclusions. I don't think they were accurate, but the key point is she doesn't say where she gets them from. There was no, contrary to what counsel said, there was no evidence in the record to show prior art or this came from this prior work or that came from this prior work. All we have is a judge pulling it out of the air and saying, trust us, you know, I'm a certain age, I've seen movies in my life, and I consider this commonplace. That's a subjective way to approach this thing, but this is supposed to be, I understood, from an extrinsic test point of view, a professional, detailed, analytic, probative analysis. If we're talking about what the average reasonable person should take away from these two works, that's the intrinsic test, as I understand it. It's not the extrinsic test. Look, now, I understand that these cases, when you're talking about ideas and expression of the ideas and, you know, protectable elements standing alone, these are complicated concepts and sometimes it can be a very fine line. What I'm telling your honors is that this case is not funky films or Binet. This is a case, yes, there is a subplot and that subplot is not found in Trouble with the Curve, but as the Second Circuit said many, many decades ago, a plagiarist cannot excuse what he did by pointing to that portion of the plaintiff's work that he didn't steal. And what I'm saying is there is sufficient plot line of protectable elements here that go from the beginning of the story to the end, which are substantially similar, if not identical in many respects. They are materially important, qualitatively important, and there's a lot of them. And I believe that when you consider all that, that makes this a triable issue of fact and that a reasonable juror I'm not going to quarrel with what the district judge did in the sense that if that's her view of what she sees, fine. But that's not the test. The test is could a reasonable juror disagree with her and find substantial similarity? In this case, I think the answer to that is yes. Thank you, Mr. Kulik. Ms. Klein, as well, I think this was an exceptionally well-briefed and argued case and I thank both counsel. We'll stand in recess. And amicus. I would like that, too. All rise.
judges: Tashima, Silverman, Graber